PETER A. BRANDT (CA Bar No. 241287)
pbrandt@humanesociety.org
HALLIE G. SEARS (DC Bar No. 1001756)
(admitted, *pro hac vice*)
hsears@humanesociety.org
THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, NW
Washington, DC 20037
Telephone:  202-676-2335
Facsimile:  202-676-2357
*Attorneys for Proposed Amici*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL,<br><br>Plaintiff;<br><br>v.<br><br>KAMALA D. HARRIS, in her official capacity as Attorney General of California, and CHARLTON H. BONHAM, in his official capacity as Director of the California Department of Fish and Wildlife;<br><br>Defendants. | Case No. 2:14-cv-01856-GEB-AC<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF AMICUS CURIAE BRIEF OF THE HUMANE SOCIETY OF THE UNITED STATES AND THE FUND FOR ANIMALS; DECLARATION OF HALLIE G. SEARS**<br><br>Date:      July 27, 2015<br>Time:      9:00 a.m.<br>Judge:     Hon. Garland E. Burrell, Jr. |

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF AMICUS CURIAE BRIEF

## REQUEST FOR JUDICIAL NOTICE

*Amici* The Humane Society of the United States ("HSUS") and The Fund for Animals ("The Fund") (together, *Amici*) respectfully request this Court to take judicial notice of the following documents attached as Exhibits A-C. This request is made pursuant to Rule 201 of the Federal Rules of Evidence and the authorities cited below.[1]

| Exhibit | Description |
|---------|-------------|
| A | California Ballot Pamphlet 28-31 (Prop. 197 Amendment of the California Wildlife Protection Act of 1990, Mountain Lions (Mar. 26, 1996)), *available at* http://repository.uchastings.edu/cgi/viewcontent.cgi?article=2117&context=ca_ballot_props. |
| B | Bob Schwartz, California Elections/Wildlife Protection Act: Initiative Would Prohibit Cougar Hunt, Buy Habitat, LOS ANGELES TIMES (May 6, 1990), *available at* http://articles.latimes.com/1990-05-06/news/mn-278_1_wildlife-protection-act. |
| C | Rich Roberts, The Lion's Share of Controversy: Prop. 117: The Ballot Initiative Would Prevent Hunting Mountain Lions, and It Incites Emotions from Both Sides of the Issue, LOS ANGELES TIMES (May 29, 1990), *available at* http://articles.latimes.com/1990-05-29/sports/sp-229_1_female-mountain-lion. |

Federal Rule of Evidence 201(b) allows the Court to take judicial notice of any fact "not subject to reasonable dispute that is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot readily be questioned." Fed. R. Evid. 201(b).  On a motion to dismiss, a court may take judicial notice of matters of public record in accordance with Federal Rule of Evidence 201 without converting the motion to dismiss to a motion for summary judgment.  *Lee v. City of Los Angeles*, 250 F.3d 688, 688-89 (9th Cir. 2001) (citing *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986).

---

[1] This Request for Judicial Notice is identical to the request for notice submitted with *Amici's* brief in support of dismissal of the original complaint, to which Plaintiff did not object (without conceding the relevance of the documents to be noticed).  *See* Opp. To Motion for Leave to File Amicus Brief at 7, n.10, Dkt. No. 21.

1    Exhibit A to this request for judicial notice is a pamphlet prepared by the California

2    Secretary of State for the voting public analyzing measures that would appear on the ballot in the

3    State's 1996 primary election, including Proposition 197, a measure that sought to amend the

4    Mountain Lion Prohibition at issue in this litigation.  Proposition 197 failed; however, subsequent

5    and less controversial amendments to Proposition 117 were passed by the Legislature.  *See*

6    California Fish & Game Code §§ 4800-4810.  As part of the legislative history for the Mountain

7    Lion Prohibition, Exhibit A is a proper matter for judicial notice.  *See Anderson v. Holder,* 673

8    F.3d 1089, 1094, n.1 (9th Cir.2012) (taking notice of excerpts of a Senate Report); *In re Google*

9    *Inc.,* 2013 WL 5423918, *6 (N.D.Cal. Sept. 26, 2013) (not reported in F. Supp. 2d) ("Proper

10   subjects when ruling on a motion to dismiss include legislative history reports.") (citing

11   *Anderson*, 673 F.3d at 1094, n.1).

12   Exhibits B and C to this request for judicial notice are newspaper articles discussing the

13   policy changes and public discourse leading up to the passage of Proposition 117.  Proposed

14   *Amici* rely on these published articles to establish that various bases and purposes for Propositions

15   117 were presented to the public, including arguments specifically relating to mountain lion

16   hunting.  The Court "may take judicial notice of publications introduced to 'indicate what was in

17   the public realm at the time, not whether the contents of those articles were in fact true.'"  *Von*

18   *Saher v. Norton Simon Museum of Art*, 592 F. 3d 954, 960 (9th Cir. 2010) (quoting *Premier*

19   *Growth Fund v. Alliance Capital Mgmt.,* 435 F.3d 396, 401 n.15 (3d Cir. 2006)).

20   For the foregoing reasons, Exhibits A-C may be properly considered by the Court in

21   ruling on Defendants' Motion to Dismiss.

22

23

24

25

26

27

28

1

2   Dated:  June 26, 2015                    Respectfully submitted,

3

4                                        By: /s/ Hallie G. Sears

5                                            Hallie G. Sears (DC Bar No. 1001756)
                                             (*admitted pro hac vice*)
6                                            hsears@humanesociety.org
                                             Peter A. Brandt (CA Bar No. 241287)
7                                            pbrandt@humanesociety.org
                                             THE HUMANE SOCIETY OF THE UNITED STATES
8                                            2100 L Street, NW, Washington, DC 20037
9                                            Telephone: 202-676-2335
                                             Facsimile: 202-676-2357
10                                           *Attorneys for Proposed Amici*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF AMICUS CURIAE BRIEF

1

**DECLARATION OF HALLIE G. SEARS**

2

I, Hallie G. Sears, declare as follows:

3     1. I am an attorney employed by The Humane Society of the United States, and I serve as

4        counsel to that organization and The Fund for Animals in the above-captioned matter.

5     2. Except as otherwise stated, I have personal knowledge of the facts set forth in this

6        declaration, and if called upon as a witness I could testify competently as to those facts.

7     3. A true and correct copy of California Ballot Pamphlet 28-31 (Prop. 197 Amendment of

8        the California Wildlife Protection Act of 1990, Mountain Lions (Mar. 26, 1996)),

9        *available at* http://librarysource.uchastings.edu/ ballot_pdf/1996p.pdf, is attached as

10       **Exhibit A**.

11    4. A true and correct copy of Bob Schwartz, California Elections/Wildlife Protection Act:

12       Initiative Would Prohibit Cougar Hunt, Buy Habitat, LOS ANGELES TIMES (May 6, 1990),

13       *available at* http://articles.latimes.com/1990-05-06/news/mn-278_1_wildlife-protection-

14       act, is attached as **Exhibit B**.

15    5. A true and correct copy of Rich Roberts, The Lion's Share of Controversy: Prop. 117: The

16       Ballot Initiative Would Prevent Hunting Mountain Lions, and It Incites Emotions from

17       Both Sides of the Issue, LOS ANGELES TIMES (May 29, 1990), *available at*

18       http://articles.latimes.com/1990-05-29/sports/sp-229_1_female-mountain-lion., is attached

19       as **Exhibit C**.

20

21       I declare under penalty of perjury under the laws of the United States of America that the

22   foregoing is true and correct.

23

24       Executed on June 26, 2015 in Washington, D.C.

25

26                  By: /s/ Hallie G. Sears

                      Hallie G. Sears

27

28

# Exhibit A

University of California, Hastings College of the Law

# UC Hastings Scholarship Repository

Propositions                      California Ballot Propositions and Ballot Initiatives

1996

# Amendment of the California Wildlife Protection Act of 1990 (Proposition 117). Mountain Lions.

Follow this and additional works at: http://repository.uchastings.edu/ca_ballot_props

Recommended Citation

Amendment of the California Wildlife Protection Act of 1990 (Proposition 117). Mountain Lions. California Proposition 197 (1996).
http://repository.uchastings.edu/ca_ballot_props/1118

This Proposition is brought to you for free and open access by the California Ballot Propositions and Ballot Initiatives at UC Hastings Scholarship
Repository. It has been accepted for inclusion in Propositions by an authorized administrator of UC Hastings Scholarship Repository. For more
information, please contact emickt@uchastings.edu.



# 197

## Amendment of the California Wildlife Protection Act of 1990 (Proposition 117). Mountain Lions. Legislative Initiative Amendment.

### Official Title and Summary Prepared by the Attorney General

### AMENDMENT OF THE CALIFORNIA WILDLIFE PROTECTION ACT OF 1990 (PROPOSITION 117). MOUNTAIN LIONS. LEGISLATIVE INITIATIVE AMENDMENT.

- Repeals mountain lion's status as specially protected mammal. Requires Fish and Game Commission to manage mountain lions as it manages mammals that are not rare, endangered, threatened.
- Requires Fish and Game Department implement mountain lion management plan that promotes health, safety, livestock, property protection; identifies priority zones where mountain lion removal has not alleviated threats.
- Authorizes taking of mountain lions in priority zones, consistent with plan. Permits governmental agencies, landowners to take mountain lions imminently threatening public health, safety, or livestock.
- Allows legislative amendments.

### Summary of Legislative Analyst's Estimate of Net State and Local Government Fiscal Impact:

- Reallocates funds in the Habitat Conservation Fund of up to $250,000 annually for 1996–97, 1997–98, and 1998–99, and up to $100,000 annually thereafter until July 1, 2020, to prepare and implement a mountain lion management plan.
- Potential additional state costs of up to $250,000 annually to administer public safety and public information programs related to mountain lions.

### Final Votes Cast by the Legislature on SB 28 (Proposition 197)

Assembly: Ayes 44    Senate: Ayes 26
Noes 30    Noes  8

## Analysis by the Legislative Analyst

### Background

In 1990, the California voters approved Proposition 117, the California Wildlife Protection Act of 1990. The act designated mountain lions as a specially protected mammal, and generally prohibited their taking (that is, hunting or killing), injury, possession, or sale. However, Proposition 117 allows the killing of a mountain lion if it (1) is perceived to be an imminent threat to public health or safety, (2) damages livestock or other property, or (3) is attacking people. In 1994, for example, 131 mountain lions were killed because they threatened public safety or damaged property or livestock.

Proposition 117 generally permits the Legislature to amend its provisions relating to mountain lions with a four-fifths vote of the members of both houses, but only if the amendments are consistent with the purposes of the act.

Proposition 117 also created the Habitat Conservation Fund (HCF). This fund is generally used to support the acquisition of lands for the protection of mountain lions, deer, rare, endangered, and threatened animals and plant life, wetlands, and park purposes. Proposition 117 required that the HCF receive $30 million a year. This funding comes from the state's General Fund and various environmental funds.

The state Fish and Game Commission is generally responsible for regulating the protection and use of wildlife species which are not rare, threatened, or endangered, in order to achieve a variety of goals. The commission does this by regulating the hunting, capturing, and killing of wildlife, including establishing hunting seasons; promoting public education; and protecting and enhancing habitat. The commission's policies are implemented by the Department of Fish and Game.

Proposition 117 prohibits the commission or the Department of Fish and Game from adopting regulations that conflict with its provisions.

### Proposal

This measure amends Proposition 117's provisions related to mountain lions. Specifically, the measure does the following:

- Changes the vote requirement—from four-fifths to majority vote—for the Legislature to amend or repeal provisions of law concerning mountain lions, and eliminates the requirement that such changes be consistent with the purposes of Proposition 117.
- Eliminates the designation of the mountain lion as a specially protected mammal in California, and requires the Fish and Game Commission to regulate mountain lions in the same manner as it regulates other mammals which are not rare, endangered, or threatened.
- Requires the Department of Fish and Game to prepare a mountain lion management plan for the commission's approval and to implement the adopted plan. As part of the plan, the department must identify priority zones where the removal of individual mountain lions has not alleviated threats to public safety, livestock, domestic animals, other property, and other wildlife species. The measure authorizes the department to regulate, hunt, or kill mountain lions in priority zones if it has a plan for that zone. In addition, such actions must be consistent with the plan and maintain a viable mountain lion population in the zone.
- Authorizes the Department of Fish and Game to designate persons and government entities to remove or kill mountain lions that are perceived to be an imminent threat to public health or safety or livestock.

### Fiscal Effect

The measure reallocates existing funds in the HCF from land acquisition to the Department of Fish and Game to prepare and implement the mountain lion management plan. The reallocation would be up to $250,000 annually for 1996–97, 1997–98, and 1998–99, and up to $100,000 annually thereafter until July 1, 2020. The exact amount would depend on legislative action.

In addition, the measure declares the Legislature's intent that up to $250,000 be appropriated annually from sources other than the HCF for public safety and public information programs related to mountain lions.

---

**For the text of Proposition 197 see page 59**

---

# 197

## Amendment of the California Wildlife Protection Act of 1990 (Proposition 117). Mountain Lions. Legislative Initiative Amendment.

### Argument in Favor of Proposition 197

California's wildlife should be protected by experts at the Department of Fish and Game, and not be a political pawn of special interest groups. Proposition 197 does just that. It returns control of the mountain lion to the experts.

In 1990, control of the mountain lion was removed from wildlife experts. That was a mistake. As usual, politicians in charge have done nothing to fix the problem. This predator has outgrown its habitat; deer and elk herds, as well as Big Horn sheep, have been over-killed by lions; livestock have been killed, costing consumers millions of dollars; pets have become common prey for hungry lions in populated areas; and, we now have confirmed deaths of people killed by mountain lions near populated areas.

California's mountain lion population has grown to dangerous levels in recent years, and Fish and Game experts across the state agree a lack of management is the principal reason. The California lion is *not* an endangered species—its population has actually doubled in recent years. Proposition 197 allows the Department of Fish and Game to create and adopt a plan keeping the proper environmental balance and insuring the safety of people in residential and recreational areas.

Proposition 197 is supported by a broad coalition of wildlife experts, Fish and Game officials, agricultural leaders, and law enforcement who want to preserve the delicate balance of nature.

In recent years the lion population has grown so fast they have outgrown their food supply. Desperate for food, lions are being forced out of their natural habitat into existing residential and commercial developments where children and pets are in severe danger. A rural school district won't let children leave the school bus alone; parents in some towns were advised not to allow small children to go outside alone; and a lion had to be killed after attacking police officers in the parking lot of a popular San Bernardino mall.

Proposition 197 allows the Department of Fish and Game to do what it does best—manage the state's lion population to preserve the delicate balance between man and nature. This wildlife protection measure is intended to protect not only the mountain lion, but also the people, livestock, and pets from inhumane slaughter.

Please vote yes on Proposition 197. Vote to protect the public from dangerous predators; vote to allow wildlife experts do their job; and vote to restore common sense to wildlife management.

**JACK PARNELL**
*Former Director, California Department of Fish and Game*

**DONALD NEAL**
*Wildlife Habitat Ecologist*

When a mountain lion killed a young mother of two children while she was jogging near her home, I knew it was time we had to bring some common sense wildlife management to this problem. As her State Senator, it would be horrible for her death to be in vain.

People tried to make political gain out of the mountain lion, instead of relying on the experts to manage these animals. That's why I received overwhelming bi-partisan support in the Legislature for Proposition 197—giving the experts at Fish and Game the responsibility of taking care of California's wildlife so we can all live together safely.

**STATE SENATOR TIM LESLIE**
*Author of Proposition 197*

### Rebuttal to Argument in Favor of Proposition 197

This is a gun lobby attempt to manipulate the horrible death of a mother to fool voters into legalizing the trophy hunting of mountain lions.

They claim wildlife officials need to manage lions. We agree. The fact is, after this horrible attack, we supported legislation to force the Department of Fish and Game to protect the public. The measure toughened law enforcement officials' power to kill lions on the spot whenever the public is threatened. Gun lobby backers of Proposition 197 opposed it because *it preserved the 1990 voter-approved ban on sport hunting mountain lions.*

Proponents' arguments are as phony as Proposition 197 is dishonest. The "special interests" they refer to, are the voters. Voters stopped sport hunting of lions in 1990, not "special interests." The voters *didn't* stop state bureaucrats from controlling lions. Senator Tim Leslie, author of 197, and his gun lobby backers, don't want to make it easier to kill lions that threaten the public unless *they* can kill them for the fun of it.

Don't be fooled.

Making it easier to kill mountain lions that threaten the public *or* spending nearly $3 million for a management plan for lions doesn't require voter approval. Only the voters can change the 1990 ban on trophy hunting. That's why Proposition 197 is on the ballot. But the gun lobby isn't honest enough to say that. We support managing lions. But they shouldn't be shot just to be stuck on the wall in the den.

It's fraud. Vote no.

**PATRICIA FORKAN**
*Executive Vice President, Humane Society of the United States*

**JILL DAMPIER**
*California Park Rangers Association*

**BERNADETTE M. ERTL**
*Chair, Sierra Club California*

# Amendment of the California Wildlife Protection Act of 1990 (Proposition 117). Mountain Lions. Legislative Initiative Amendment.

## 197

## Argument Against Proposition 197

PROPOSITION 197 IS A FRAUD.

Proposition 197 legalizes trophy hunting of mountain lions, while the words "sport or trophy hunting" are cleverly omitted from the measure. IN 1990 THE VOTERS PASSED A BAN ON THE TROPHY HUNTING OF MOUNTAIN LIONS.

Proposition 197 backers know that if voters understand that this measure legalizes the sport hunting of mountain lions, it will lose. So, the National Rifle Association (NRA), the Gun Owners of California, and the Safari Club International carefully crafted a measure that never mentions legalizing sport hunting.

Nevertheless, the Safari Club's recent November newsletter told its members the real story:

"Sport hunting can resume. Under Section 1801, the department [of Fish and Game] can propose and the Fish and Game Commission can adopt regulations to allow the sport hunting of mountain lions."

Proposition 197 proponents want you to think this measure has something to do with keeping mountain lions out of urban areas. It doesn't. If these 13 words were written into Proposition 197, we could support it:

"Nothing in this measure legalizes the sport or trophy hunting of mountain lions."

We support Fish and Game doing what it should have done five years ago: prepare a mountain lion management plan, identifying those regions that have mountain lion problems, and take steps to address those problems.

Proposition 197 backers opposed legislation that would create a management plan, clarify existing law about when a mountain lion can be killed, and CONTINUE THE BAN ON SPORT HUNTING OF MOUNTAIN LIONS FIRST SIGNED INTO LAW IN 1972 BY GOVERNOR RONALD REAGAN.

Top bureaucrats in the Department of Fish and Game and the NRA are playing a game of "chicken" with the public. The bureaucrats are dragging their feet in enforcing existing law that requires them to kill mountain lions "perceived to be an imminent threat" to any person, until they get the nearly $3 million they say they need to do their job. The NRA, the Gun Owners, and Safari Club oppose any clarification of law or additional funds for management unless sport or trophy hunting is legalized. That's political blackmail!

OPPOSE PROPOSITION 197.

Hunting mountain lions for sport is cruel and unnecessary. A pack of radio collared hounds is set on the trail of the big cat until the exhausted lion seeks refuge in a tree. The trophy hunter (who often is called in from out-of-state after paying huge fees to the houndsmen) then drives in to blast the lion off the limb at point blank range. When nursing mothers are shot, the kittens starve. Often, the head is severed from the carcass and becomes the "trophy"—stuffed and put on a wall.

THIS IS NOT SPORT; IT IS SLAUGHTER!

Send the Legislature a clear message: We don't want trophy hunting of lions legalized! We want mountain lions managed like any other wildlife resource.

Proposition 197 cleverly legalizes sport hunting of mountain lions.

JOIN WITH THE SIERRA CLUB—

VOTE NO ON PROPOSITION 197.

DON'T BE FOOLED BY THE GUN OWNERS' LOBBYISTS.

**HENRY MELLO**
*State Senator, Watsonville*

**MAURICE H. GETTY**
*President, California Park Rangers Association*

**WAYNE PACELLE**
*Vice President of Government Affairs
Humane Society of the U.S.*

## Rebuttal to Argument Against Proposition 197

The opposition is wrong! Proposition 197 has *nothing* to do with trophy hunting. *It is about restoring common sense to wildlife management.*

Current law prohibits the Department of Fish and Game from doing its job of managing California's wildlife and controlling the mountain lion population explosion. Proposition 197 requires experts at the Department adopt a sensible approach to wildlife management.

Nature is a precious resource, but because the lion population has recently doubled, the delicate balance has been shattered. Look at some alarming incidents recently reported by the media:

Two small children woke up one morning without a mother because a lion ate her;

A lion preying upon neighborhood pets was found with parts of five different puppies in its stomach;

Some schools have had to cancel recess because lions were found to be lurking around the playground.

It is time to let the experts at Fish and Game do their job—they must be allowed to manage the lion. These are not bloodthirsty hunters. These are experts concerned about preserving and protecting California's precious environmental balance.

Wildlife experts and biologists are responsible for managing *all* species. The mountain lion is preventing them from doing their job. They must manage the lion population to save the thousands of deer, elk, and endangered bighorn sheep being eaten each year.

The Department of Fish and Game and wildlife experts agree—We need Proposition 197 to restore common sense to wildlife management. Cast your vote for the environment. Vote yes on Proposition 197.

**TERRENCE M. EAGAN**
*Former Undersecretary, California Resources Agency*

**WAYNE LONG**
*Former Chairman, California Resource
Conservation Commission*

**STEVEN J. ARROYO**
*Father of Mountain Lion Attack Victim*

190.2. (a) The penalty for a defendant who is found guilty of murder in the first degree shall be is death or confinement imprisonment in the state prison for a term of life without the possibility of parole in any case in which if one or more of the following special circumstances has been found under Section 190.4 , to be true:

'1) The murder was intentional and carried out for financial gain.

.2) The defendant was previously convicted previously of murder in the first degree or second degree. For the purpose of this paragraph , an offense committed in another jurisdiction , which if committed in California would be punishable as first or second degree murder , shall be deemed murder in the first or second degree.

(3) The defendant has , in this proceeding , has been convicted of more than one offense of murder in the first or second degree.

(4) The murder was committed by means of a destructive device, bomb, or explosive planted, hidden , or concealed in any place, area, dwelling, building , or structure, and the defendant knew , or reasonably should have known , that his or her act or acts would create a great risk of death to a human being one or more human beings.

(5) The murder was committed for the purpose of avoiding or preventing a lawful arrest or to perfect, or attempt , or perfecting or attempting to perfect , an escape from lawful custody.

(6) The murder was committed by means of a destructive device, bomb, or explosive that the defendant mailed or delivered, attempted to mail or deliver, or cause caused to be mailed or delivered , and the defendant knew , or reasonably should have known , that his or her act or acts would create a great risk of death to a human being one or more human beings.

(7) The victim was a peace officer, as defined in Section 830.1, 830.2, 830.3, 830.31, 830.32, 830.33, 830.34, 830.35, 830.36, 830.37, 830.4, 830.5, 830.6, 830.10, 830.11 , or 830.12, who, while engaged in the course of the performance of his or her duties , was intentionally killed, and the defendant knew , or reasonably should have known , that the victim was a peace officer engaged in the performance of his or her duties; or the victim was a peace officer , as defined in the above-enumerated above-enumerated sections of the Penal Code , or a former peace officer under any of such those sections, and was intentionally killed in retaliation for the performance of his or her official duties.

(8) The victim was a federal law enforcement officer or agent ; who, while engaged in the course of the performance of his or her duties , was intentionally killed, and the defendant knew , or reasonably should have known , that the victim was a federal law enforcement officer or agent ; engaged in the performance of his or her duties; or the victim was a federal law enforcement officer or agent, and was intentionally killed in retaliation for the performance of his or her official duties.

.9) The victim was a firefighter , as defined in Section 245.1, who , while gaged in the course of the performance of his or her duties , was intentionally .led, and the defendant knew , or reasonably should have known , that the victim was a firefighter engaged in the performance of his or her duties.

(10) The victim was a witness to a crime who was intentionally killed for the purpose of preventing his or her testimony in any criminal or juvenile proceeding, and the killing was not committed during the commission ; or attempted commission , of the crime to which he or she was a witness; or the victim was a witness to a crime and was intentionally killed in retaliation for his or her testimony in any criminal or juvenile proceeding. As used in this paragraph , "juvenile proceeding" means a proceeding brought pursuant to Section 602 or 707 of the Welfare and Institutions Code.

(11) The victim was a prosecutor or assistant prosecutor or a former prosecutor or assistant prosecutor of any local or state prosecutor's office in this state or any other state, or of a federal prosecutor's office , and the murder was intentionally carried out in retaliation for , or to prevent the performance of , the victim's official duties.

(12) The victim was a judge or former judge of any court of record in the local, state , or federal system in the State of California, or in this or any other state of the United States , and the murder was intentionally carried out in retaliation for , or to prevent the performance of , the victim's official duties.

(13) The victim was an elected or appointed official or former official of the federal government, or of a any local or state government of California, or of any local or state government of any other state in the United States this or any other state, and the killing was intentionally carried out in retaliation for , or to prevent the performance of , the victim's official duties.

(14) The murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity. As utilized used in this section, the phrase especially "especially heinous, atrocious , or cruel , manifesting exceptional depravity depravity" means a conscienceless ,or pitiless crime which that is unnecessarily torturous to the victim.

(15) The defendant intentionally killed the victim while lying in wait.

(16) The victim was intentionally killed because of his or her race, color, religion, nationality , or country of origin.

(17) The murder was committed while the defendant was engaged in , or was an accomplice in , the commission of, attempted commission of , or the immediate flight after committing , or attempting to commit , the following felonies:

(i)

(A) Robbery in violation of Section 211 or 212.5.

(ii)

(B) Kidnapping in violation of Section 207 or , 209 , or 209.5 .

(iii)

(C) Rape in violation of Section 261.

(iv)

(D) Sodomy in violation of Section 286.

(v)

(E) The performance of a lewd or lascivious act upon the person of a child under the age of 14 years in violation of Section 288.

(vi)

(F) Oral copulation in violation of Section 288a.

(vii)

(G) Burglary in the first or second degree in violation of Section 460.

(viii)

(H) Arson in violation of subdivision (b) of Section 451.

(ix)

(I) Train wrecking in violation of Section 219.

(J) Mayhem in violation of Section 203.

(K) Rape by instrument in violation of Section 289.

(L) Carjacking, as defined in Section 215.

(18) The murder was intentional and involved the infliction of torture.

(19) The defendant intentionally killed the victim by the administration of poison.

(20) The victim was a juror in any court of record in the local, state, or federal system in this or any other state, and the murder was intentionally carried out in retaliation for, or to prevent the performance of, the victim's official duties.

(21) The murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person or persons outside the vehicle with the intent to inflict death. For purposes of this paragraph, "motor vehicle" means any vehicle as defined in Section 415 of the Vehicle Code.

(b) Unless an intent to kill is specifically required under subdivision (a) for a special circumstance enumerated therein, an actual killer, or as to whom such the special circumstance has been found to be true under Section 190.4 , need not have had any intent to kill at the time of the commission of the offense which is the basis of the special circumstance in order to suffer death or confinement in the state prison for a term of life without the possibility of parole.

(c) Every person , not the actual killer , who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall suffer be punished by death or confinement imprisonment in the state prison for a term of life without the possibility of parole , in any case in which if one or more of the special circumstances enumerated in subdivision (a) of this section has been found to be true under Section 190.4.

(d) Notwithstanding subdivision (c), every person , not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) ; which felony results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall suffer be punished by death or confinement imprisonment in the state prison for life without the possibility of parole , in any case in which if a special circumstance enumerated in paragraph (17) of subdivision (a) of this section has been found to be true under Section 190.4.

The penalty shall be determined as provided in this section and Sections 190.1, 190.2, 190.3, 190.4, and 190.5.

SEC. 3. This act affects an initiative statute, and shall become effective only when submitted to, and approved by, the voters pursuant to subdivision (c) of Section 10 of Article II of the California Constitution.

SEC. 4. Section 2 of this bill incorporates amendments to Section 190.2 of the Penal Code proposed by both this bill and SB 32. It shall only become operative if (1) both this bill and SB 32 are submitted to and approved by the voters pursuant to subdivision (c) of Section 10 of Article II of the California Constitution and become effective on the same date, (2) each bill amends Section 190.2 of the Penal Code, and (3) this bill receives more affirmative votes from the voters than SB 32, in which case Section 1 of this bill shall not become operative.

---

## Proposition 197: Text of Proposed Law

This law proposed by Senate Bill 28 (Statutes of 1995, Chapter 779) is submitted to the people in accordance with the provisions of Article II, Section 10 of the Constitution.

This proposed law amends and adds sections to the Fish and Game Code, and 1ends a section of an initiative; therefore, existing provisions proposed to be ..eleted are printed in strikeout type and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

**PROPOSED LAW**

SECTION 1. The Legislature finds and declares, as follows:

(a) It is appropriate for the Legislature and the Department of Fish and Game to act prudently to address the needs of our changing society. California's complex and ever-changing population requires that the department and the Legislature respond to emergencies and exigencies to safeguard the health and safety of the people of the state and to balance the needs of the people with the necessity to

preserve the wildlife ~~and its habitat for the enjoyment of the people.~~

(b) The wildlife species known as the mountain lion is the only specially protected mammal in the State of California; the mountain lion species is neither threatened nor endangered in the State of California; and the management of mountain lions by the Department of Fish and Game is prohibited by the passage of Proposition 117 by the voters in June, 1990.

(c) The presence of mountain lions pose a threat to people, pets, and livestock, as evidenced by the dramatic increase in the number of life-threatening and life-taking confrontations between mountain lions and people, including at least two confirmed deaths from mountain lion attacks in the past 12 months.

(d) The increase in mountain lion sightings and incidents in residential areas has caused great concern for the safety and well-being of rural and suburban residents, including small children.

(e) Wildlife authorities have determined that sightings and incidents involving mountain lions and people will continue to increase.

(f) The escalating loss of life and cost of injury to people, pets, and livestock caused by mountain lions has resulted, and will continue to result, in increased expenditures by public safety agencies.

(g) Proposition 117 mandates the expenditure of nine hundred million taxpayer dollars at a rate of thirty million dollars per year for thirty years, none of which is used to protect people or manage mountain lions.

(h) In order to maintain a healthy population and to minimize confrontations with humans and livestock, it is necessary to prepare and implement scientifically sound management plans.

SEC. 2.   Section 2786 of the Fish and Game Code is amended to read:

2786.   Except as otherwise expressly provided in paragraph (3) of subdivision (a) of Section 2787, the money in the Habitat Conservation Fund, which is hereby created, shall be used for the following purposes:

(a) The acquisition of habitat, including native oak woodlands, necessary to protect deer and mountain lions.

(b) The acquisition of habitat to protect rare, endangered, threatened, or fully protected species.

(c) The acquisition of habitat to further implement the Habitat Conservation Program pursuant to Article 2 (commencing with Section 2721) excepting Section 2722 and subdivision (a) of Section 2723, and Sections 2724 and 2729.

(d) The acquisition, enhancement, or restoration of wetlands.

(e) The acquisition, restoration, or enhancement of aquatic habitat for spawning and rearing of anadromous salmonids and trout resources.

(f) The acquisition, restoration, or enhancement of riparian habitat.

*(g) The preparation and implementation of a mountain lion management plan pursuant to Section 4800.*

SEC. 3.   Section 2787 of the Fish and Game Code is amended to read:

2787.   Notwithstanding Section 13340 of the Government Code, the money in the fund is continuously appropriated, without regard to fiscal years, as follows:

(a) To the Department of Parks and Recreation, four million five hundred thousand dollars ($4,500,000) annually for allocation as follows:

(1) One million five hundred thousand dollars ($1,500,000) for projects that are located in the Santa Lucia Mountain Range in Monterey County for expenditure by the Department of Parks and Recreation and for grants to the Monterey Peninsula Regional Park District.

(2) One million dollars ($1,000,000) for acquisitions in, and adjacent to, units of the state park system.

(3) Two million dollars ($2,000,000) for 50 percent matching grants to local agencies for projects meeting the purposes specified in Section 2786 and, additionally, for the acquisition of wildlife corridors and urban trails, nature interpretation programs, and other programs which bring urban residents into park and wildlife areas. The grants made pursuant to this subdivision are subject to the conditions of subdivision (d) of Section 5910, and Sections 5917 and 5919, of the Public Resources Code, as nearly as may be practicable.

(b) To the State Coastal Conservancy, four million dollars ($4,000,000) annually.

(c) To the Santa Monica Mountains Conservancy, five million dollars ($5,000,000) annually for the next 10 fiscal years, commencing with the 1990–91 fiscal year. The money shall be used for the purposes specified in Section 2786 for wildlife habitat, and for related open-space projects, within the Santa Monica Mountains Zone, the Rim of the Valley Corridor, and the Santa Clarita Woodlands. Of the total amount appropriated pursuant to this subdivision, not less than a total of ten million dollars ($10,000,000) shall be spent within the Santa Susana Mountains and the Simi Hills, and not less than a total of ten million dollars ($10,000,000) shall be spent within the Santa Clarita Woodlands. These funds shall be expended in accordance with Division 23 (commencing with Section 33000) of the Public Resources Code during the operative period of this section as specified in subdivision (f) and in Section 2797. The Legislature may, by statute, extend the period for expenditure of the funds provided by this ~~paragraph~~ *subdivision* .

(d) To the California Tahoe Conservancy, five hundred thousand dollars ($500,000) annually.

(e) *To the department to pay the costs of preparing and implementing the mountain lion management plan pursuant to Section 4800, a sum not to exceed two hundred fifty thousand dollars ($250,000) for each of the 1996–97, 1997–98, and 1998–99 fiscal years, and a sum not to exceed one hundred thousand dollars ($100,000) for each fiscal year thereafter. It is also the intent of the Legislature that an amount not to exceed two hundred fifty thousand dollars ($250,000) be appropriated annually from a source or sources other than the fund for public safety and public information programs related to mountain lions.*

*(f)* To the board, the balance of the fund.

~~(f) This section~~ *(g) The amendments to this section, as approved by the voters at* the March 26, 1996, primary election, shall become operative on ~~July 1, 1990, and,~~

at ~~March 27, 1996, which section shall remain in effect until~~ July 1, 2020, *and as of that date is repealed, unless a later enacted statute, which becomes effective on or before July 1, 2020, deletes or extends that date.*

SEC. 4.   Section 4800 of the Fish and Game Code is amended to read:

4800.   (a)   The *commission shall regulate the* mountain lion (genus Felis) ~~is a specially protected mammal~~ *pursuant to Chapter 2 (commencing with Secti 200) of Division 1, and the department shall carry out the regulations of . commission and manage those mammals in the same manner as it carries ou other regulations of the commission and manages other mammals that are not rare, endangered, or threatened species under the laws of this state.*

*(b) Pursuant to subdivision (a), the department shall prepare, submit to the commission for approval, and implement a mountain lion management plan that promotes health and safety protection and protection for livestock, domestic animals, other property, and other wildlife species and that implements Section 1801. The plan shall identify zones based on the department's estimates of mountain lion densities developed from the best information available to the department. The department shall designate the zones that are priority zones where the removal of individual mountain lions to protect public safety, livestock, domestic animals, other property, and other wildlife species has not alleviated threats. In designating priority zones, the department may consider, based on the best information available to the department, where the mountain lion population is depleting other wildlife species or where the mountain lion population may cause any of the following: (1) the extinction of threatened or endangered species; (2) mountain lion depredation of livestock and domestic animals; or (3) a threat to public health and safety. The taking of a mountain lion that is attacking an individual member of a wildlife species other than threatened or endangered species shall not be authorized based on that act alone. Except as otherwise provided in this chapter, the department shall not manage, regulate, or take mountain lions in a priority zone, as provided in this section or Section 4801, unless there is a plan for that zone and the department makes a finding that managing, regulating, or taking mountain lions is consistent with the plan for that zone and maintains a viable mountain lion population in that zone.*

(c)   It is unlawful to take, injure, possess, transport, import, or sell any mountain lion or any part or product thereof, except as specifically provided in this chapter *or* , in Chapter 2 (commencing with Section 2116) of Division 3, *or as prescribed in regulations of the commission* . This chapter does not prohibit the sale or possession of any mountain lion or any part or product thereof, when the owner can demonstrate that the mountain lion, or part or product thereof, was in the person's possession on June 6, 1990.

~~(c)~~ *(d)* Any violation of this section is a misdemeanor punishable by imprisonment in the county jail for not more than one year, or a fine of not more than ten thousand dollars ($10,000), or by both that fine and imprisonment. An individual is not guilty of a violation of this section if it is demonstrated that, in taking or injuring a mountain lion, the individual was acting in self-defense or defense of others.

~~(d) Section 219 does not apply to this chapter. Neither the commission nor the department shall adopt any regulation that conflicts with or supersedes any of the provisions of this chapter.~~

*(e) In the case of conflict between this chapter and the California Endangered Species Act, Chapter 1.5 (commencing with Section 2050) of Division 3, the California Endangered Species Act shall prevail.*

SEC. 5.   Section 4801 of the Fish and Game Code is amended to read:

4801.   The department may remove or take ~~any mountain lion~~ , or authorize *its designee, including, but not limited to,* an appropriate ~~local~~ *governmental* agency with public safety responsibility ~~to remove or take any mountain lion, that is~~ , *an appropriate governmental agency with wildlife management responsibility, or an owner of land, to remove or take, one or more mountain lions that are* perceived to be an imminent threat to public health or safety *or livestock anywhere in the state except within the state park system. Within the state park system, the department may remove or take, or authorize an appropriate governmental agency with public safety responsibility or an appropriate governmental agency with wildlife management responsibility to remove or take, one or more mountain lions that are perceived to be an imminent threat to public health or safety only with the concurrence of the Department of Parks and Recreation* .

SEC. 6.   Section 4801.5 is added to the Fish and Game Code, to read:

*4801.5.   Prior to submittal to, and approval by, the commission of the plan required pursuant to subdivision (b) of Section 4800, the department may remove or take any mountain lion, or authorize an appropriate local agency with public safety responsibility to remove or take any mountain lion, that is perceived to be an imminent threat to public health or safety.*

SEC. 7.   Section 4806 of the Fish and Game Code is amended to read:

4806.   Any person *who has captured, injured, or killed a mountain lion within a priority zone identified in a mountain lion management plan under Section 4800 or who has been* issued a permit pursuant to Section 4803 or 4805 shall report, by telephone within 24 hours, the capturing, injuring, or killing of any mountain lion to an office of the department or, if telephoning is not practicable, in writing within five days after the capturing, injuring, or killing of the mountain lion. At the time of making the report of the capturing, injuring, or killing, the *person authorized to take the mountain lion under a mountain lion management plan approved pursuant to Section 4800 shall make the remains of the mountain lion available for inspection to department personnel upon their request pursuant to regulations adopted by the commission and the holder of the permit under Secti 4803 or 4805* shall make arrangements to turn over the mountain lion to t. entire carcass of the mountain lion which has been recovered to a representative of the department and shall do so in a timely manner.

SEC. 8.   Section 8 of the California Wildlife Protection Act of 1990, as added by Proposition 117, an initiative measure approved by the electors at the June 5,

1990, primary election, is amended to read:

Sec. 8.  Except *for amendments of subdivisions (c) and* ~~(f)~~ *(g)* of Section 2787 and subdivision (d) of Section 2796 of the Fish and Game Code to extend the operative effect of those sections *and amendments of Section 3950.1 and Chapter 10 (commencing with Section 4800) of Part 3 of Division 4 of the Fish and Game* ~~ode~~ , which may be enacted by statute enacted by the Legislature, this act shall amended only by a statute approved by a vote of four-fifths of the members of both houses of the Legislature. *Except for amendments of Section 3950.1 and*

*Chapter 10 (commencing with Section 4800) of Part 3 of Division 4 of the Fish and Game Code,* ~~Any~~ *any* amendment of this act shall be consistent with, and further the purposes of, this act, except the Legislature shall not reallocate the funds allocated by Sections 2787 and 2788 of the Fish and Game Code, change the expenditure requirements of Section 2791 of the Fish and Game Code, or change the transfers of funds required by Sections 2795 and 2796 of the Fish and Game Code.

## Proposition 198: Text of Proposed Law

This initiative measure is submitted to the people in accordance with the provisions of Article II, Section 8 of the Constitution.

This initiative measure amends and adds sections to the Elections Code; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

### PROPOSED LAW

SECTION 1.  This act shall be known and may be cited as the "Open Primary Act."

SEC. 2.  Section 2001 is added to the Elections Code, to read:

*2001.  All persons entitled to vote, including those not affiliated with any political party, shall have the right to vote, except as otherwise provided by law, at any election in which they are qualified to vote, for any candidate regardless of the candidate's political affiliation.*

SEC. 3.  Section 2151 of the Elections Code is amended to read:

2151.  At the time of registering and of transferring registration, each elector may declare the name of the political party with which he or she intends to affiliate at the ensuing primary election. The name of that political party shall be stated in the affidavit of registration and the index.

The voter registration card shall inform the affiant that any elector may decline to state a political affiliation, ~~but no person shall be entitled to vote the ballot of any political party~~ *and that all properly registered voters may vote for their choice* at any primary election ~~unless he or she has stated the name of the party with which he or she intends to affiliate~~ *for any candidate for such office regardless of political affiliation and without a declaration of political faith or allegiance* . The voter registration card shall include a listing of all qualified political parties.

~~No~~

*Notwithstanding any provision to the contrary,* no person shall be permitted to vote the ballot ~~of any party or for any delegates to the convention of any party for~~ ~~y elective political party central or district committee member~~ other than the ~~.rty~~ designated in his or her registration, except as provided by Section 2152.

SEC. 4.  Section 13102 of the Elections Code is amended to read:

13102.  (a)  All voting shall be by ballot. There shall be provided, at each polling place, at each election, and voting booth or booths for the electors, at each polling place, at each election, and ~~voting booth or booths for the electors, at each~~ polling place, at each election, one form of ballot for all candidates for public office, ~~except that, for partisan primary~~ ~~elections, one form of ballot shall be provided for each qualified political party as~~ ~~well as one form of nonpartisan ballot~~ *listing all candidates for public office* , in accordance with subdivision (b).

(b)  At ~~partisan~~ *such* primary elections, each voter ~~not registered as intending~~ ~~to affiliate with any one of the political parties participating in the election~~ shall be furnished ~~only a nonpartisan~~ *an official primary* ballot. The ~~nonpartisan~~ *official primary* ballot shall contain ~~only~~ the names of all candidates for nonpartisan *and partisan* offices and measures to be voted for at the primary election. ~~Each voter registered as intending to affiliate with a political party~~ ~~participating in the election shall be furnished only a ballot of the political party~~ ~~with which he or she is registered and the nonpartisan ballot, both of which shall~~ ~~be printed together as one ballot in the form prescribed by Section 13207.~~

SEC. 5.  Section 13203 of the Elections Code is amended to read:

13203.  Across the top of the ballot shall be printed in heavy-faced gothic capital type not smaller than 30-point, the words "OFFICIAL BALLOT." However, if the ballot is no wider than a single column, the words "OFFICIAL BALLOT" may be as small as 24-point. Beneath this heading, in the case of a ~~partisan~~ *an* *official* primary election, shall be printed in 18-point boldfaced gothic capital type the ~~official party designation or~~ the words ~~"NONPARTISAN~~ *"OFFICIAL* *PRIMARY BALLOT"* ~~as applicable~~ . Beneath the heading line or lines, there shall be printed, in boldface type as large as the width of the ballot makes possible, the number of the congressional, Senate, and Assembly district, the name of the county in which the ballot is to be voted, and the date of the election.

SEC. 6.  Section 13206 of the Elections Code is amended to read:

13206.  (a)  On the ~~partisan~~ ballot used in a direct primary election, immediately below the instructions to voters, there shall be a box one-half inch high enclosed by a heavy-ruled line the same as the borderline. This box shall be as long as there are columns for the ~~partisan~~ ballot and shall be set directly above these columns. Within the box shall be printed in 24-point boldfaced gothic capital type the words "Partisan Offices."

(b)  The same style of box described in subdivision (a) shall also appear over the columns of the nonpartisan portion of the ballot and within the box in the same style ~~nd~~ point size of type shall be printed "Nonpartisan Offices."

*(c)  This section shall not apply to ballots for elective political party central or* ~~.strict~~ *committee members prepared in accordance with Section 13300.*

SEC. 7.  Section 13230 of the Elections Code is amended to read:

13230.  (a)  If the county elections official determines that, due to the number of candidates and measures that must be printed on the ballot, the ballot will be larger than may be conveniently handled, the county elections official may provide that a ~~nonpartisan~~ ballot *for nonpartisan offices and measures* shall be given to each ~~partisan~~ voter, together with his or her ~~partisan~~ *official primary* ballot , ~~and that the material appearing under the heading "Nonpartisan Offices"~~ ~~on partisan ballots, as well as the heading itself, shall be omitted from the~~ ~~partisan ballots~~ .

(b)  ~~If the~~ *Notwithstanding Section 13300,* the county elections official ~~so~~ ~~provides,~~ *shall provide that* the procedure prescribed for the handling and canvassing of ballots shall be modified to the extent necessary to permit the use of two ballots by partisan voters. The county elections official may, in this case, order the second ballot to be printed on paper of a different tint, and assign to those ballots numbers higher than those assigned to the ballots ~~containing partisan~~ ~~offices~~ *for nonpartisan offices and measures* .

SEC. 8.  Section 13300 of the Elections Code is amended to read:

13300.  (a)  By at least 29 days before the primary *election* , each county elections official shall prepare *separate identical* sample ballots for each ~~political~~ ~~party and a separate nonpartisan ballot, placing~~ *voter, provided however, that in the case of ballots involving elective political party central or district committee members, each county elections official shall prepare separate ballots for the sole use of persons registered with that party, as provided for in Section 2151. On the official identical primary ballots, each county elections official shall place* therein in each case in the order provided in Chapter 2 (commencing with Section 13100), and under the appropriate title of each office, the names *and party affiliations* of all candidates *organized randomly as provided in Section 13112 and not grouped by political party,* for whom nomination papers have been duly filed with him or her or have been certified to him or her by the Secretary of State to be voted for in his or her county at the primary election.

(b)  The sample ~~ballot~~ *ballots* shall be identical to the official ballots, except as otherwise provided by law. The sample ballots shall be printed on paper of a different texture from the paper to be used for the official ballot.

(c)  ~~One~~ *Except as provided in Section 13230, one* sample *official primary* ballot ~~of the party to which the voter belongs, as evidenced by his or her registration,~~ shall be mailed to each voter entitled to vote at the primary not more than 40 nor less than 10 days before the election. A ~~nonpartisan sample ballot shall be so~~ ~~mailed to each voter who is not registered as intending to affiliate with any of the~~ ~~parties participating in the primary election.~~

SEC. 9.  Section 13301 of the Elections Code is amended to read:

13301.  (a)  At the time the county elections official prepares sample ballots for ~~each political party at~~ the presidential primary, he or she shall also prepare a list *with the name* of candidates for delegates for each political party. The names of the candidates for delegates of any political party shall be arranged upon the list of candidates for delegates of that party. The names of the candidates under their preference for President. The order of groups on the list shall be alphabetically according to the names of the persons they prefer appear upon the ballot. Each column shall be headed in boldface 10-point, gothic type as follows: "The following delegates are pledged to _____." (The blank being filled in with the name of that candidate for presidential nominee for whom the members of the group have expressed a preference). The names of the candidates for delegates shall be printed in eight-point, roman capital type.

(b)  Copies of the list of candidates for delegates of each party shall be submitted by the county elections official to the chairman of the county central committee of that party, and the county elections official shall post a copy of each list in a conspicuous place in his or her office.

SEC. 10.  Section 13302 of the Elections Code is amended to read:

13302.  The county elections official shall forthwith submit the sample *official primary* ballot ~~of each political party~~ to the chairperson of the county central committee of ~~that~~ *each* political party, and shall mail a copy to each candidate for whom nomination papers have been filed in his or her office or whose name has been certified to him or her by the Secretary of State, to the post office address as given in the nomination paper or certification. The county elections official shall post a copy of ~~each~~ *the* sample ballot in a conspicuous place in his or her office.

SEC. 11.  (a)  No provision of this act may be changed except by a vote of the people.

(b)  The Legislature shall amend or delete other provisions of law not encompassed by this act which conflict with the provisions herein in order to bring them into conformity with this act.

SEC. 12.  If any provision of this act or the application thereof to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of the act that can be given effect without the invalid provision or application, and to this end the provisions of this act are severable.

# Exhibit B

Case 2:11-cv-01856-GEB-AC    Document 43-3    Filed 06/26/15    Page 16 of 22

# Los Angeles Times | ARTICLE COLLECTIONS

← Back to Original Article

# CALIFORNIA ELECTIONS / WILDLIFE PROTECTION ACT : Initiative Would Prohibit Cougar Hunt, Buy Habitat

May 06, 1990 | BOB SCHWARTZ | TIMES STAFF WRITER

SACRAMENTO — Not in 18 years has a sport hunter legally shot and killed a California mountain lion--a secretive, nocturnal predator that inhabits terrain as disparate as the eastern desert, the Sierra Nevada's snowy slopes and the coastal oak woodlands of Los Angeles and Orange counties.

In 1987, the state Department of Fish and Game tried to reintroduce limited hunting of the animals, whose population statewide was estimated to have grown to about 5,100. But the plan has been repeatedly blocked by mountain lion advocates in court, with judges ruling that the state's environmental impact studies were inadequate.

This June, California voters will decide the issue for themselves: Proposition 117, or the California Wildlife Protection Act of 1990, would declare mountain lions to be a specially protected animal and prohibit sport hunting of the big cats--also called cougars, pumas or panthers--once and for all.

But the so-called mountain lion initiative is not strictly a battle between hunters and non-hunters.

The proposal has a second, perhaps more far-reaching component: It would mandate spending $900 million over the next 30 years to acquire and restore wildlife habitat, with equal amounts to be spent in Southern and Northern California.

Roughly a third of the money would be spent for mountain lion and deer habitat, leaving the rest for the purchase of rare and endangered species habitat, wetlands, and riparian and aquatic habitat.

"We wanted to focus not only on mountain lion hunting, but the broader issue as well," said J. William Yeates, a Sacramento attorney and board member of the Mountain Lion Preservation Foundation, one of the groups that drafted the initiative. "And the real issue in California is loss of habitat."

The law would guarantee $50 million over the next 10 years for the Santa Monica Mountains Conservancy, some of which must be spent in the Santa Susana Mountains and Santa Clarita Woodlands. Other amounts are guaranteed for Monterey County, the California Tahoe Conservancy and the State Coastal Conservancy.

The state Wildlife Conservation Board would receive the bulk of the annual $30 million--$16 million in each of the first 10 years of the program, $21 million a year thereafter.

Conservation groups such as the Wilderness Society, Defenders of Wildlife, the Sierra Club and the Planning and Conservation League have endorsed the initiative. Recreation-oriented conservation groups--such as the California Wildlife Federation, the California Waterfowl Assn. and Ducks Unlimited Inc.-- oppose the measure, as do hunting and ranching groups and many state wildlife biologists.

Not even the initiative's opponents dispute that habitat destruction is the single greatest threat to California wildlife. And a local population of mountain lions, each of whose home ranges may be more than 100 square miles, needs large chunks of undisturbed habitat to thrive.

But opponents say Proposition 117 locks the state into a rigid habitat acquisition formula that favors the mountain lion and deer--both non-endangered species--at the expense of species that truly need protection.

"There isn't a wildlife biologist who opposes (the purchase of) habitat," said Richard Weaver, a retired state wildlife biologist and chairman of the umbrella opposition campaign, Californians for Fair Spending on Wildlife Protection. But Proposition 117, he said, "will raid existing programs for endangered and rare wildlife species for an animal that is neither endangered nor rare. . . . I think we need to identify our most critical needs."

The initiative would not create any new funding sources. About half of the annual $30 million would come from an unallocated tobacco tax fund established by Proposition 99 two years ago that is currently earmarked for local health programs. Initiative opponents criticize the proposed diversion of this money, but proponents answer that 90% of the unallocated fund will still be available for health programs, and that spending 10% on wildlife habitat is consistent with Proposition 99's intent.

"Proposition 99 was created in this office," said Gerald Meral, director of the Planning and Conservation League and manager of the pro-117 campaign, the California Wildlife Protection Committee. "We served on it, and we were part of a major effort to pass it. Our opponents don't represent the health community."

The remainder of the $30 million will come out of existing environmental funds, such as the state's environmental license plate fund and tax check-off fund for rare and endangered species, and any future state bond issues that include money for wildlife habitat--such as the Forests Forever and Big Green initiatives being proposed for the November ballot.

Some state environmental funds are already being used for habitat acquisition and would count toward the initiative's annual requirement. Meral, in fact, says that Gov. George Deukmejian's proposed 1990-91 budget earmarks enough money for habitat acquisition and would be unchanged if the initiative passes. Opponents, however, say that might not be true in future years.

Case 2:14-cv-01856-GEB-AC   Document 43-3   Filed 08/26/15   Page 17 of 22

"The department is concerned that [the initiative's] too restrictive, and we wouldn't be able to respond to identified management needs," said Terry M. Mansfield, Fish and Game Department wildlife manager.

While they disagree on the best use of environmental funds, wildlife biologists on both sides of the issue generally agree that limited hunting would pose no threat to the state's mountain lion population. The animals, which can weigh as much as 150 pounds at maturity, are legally hunted in 11 Western states and British Columbia and are still thriving.

But initiative proponents say that the mountain lion, as California's last big predator, deserves special protection.

"There's something about mountain lions that goes to the hearts and minds of so many people," said Sharon Negri, director of the Mountain Lion Preservation Foundation. "People are surprised to hear there are mountain lions in the hills in and around some of our largest urban areas . . . and they just like to know they're there, something not packaged, bottled and canned, but something wild and free."

Hunters view the animal with less romanticism. And some ranchers see cougars as serial killers, capable of slaughtering more calves, sheep or goats in a single night than they could possibly eat in weeks.

The initiative would restrict, but not ban, so-called depredation kills--the hunting of cougars that pose a danger to human life or livestock.

But cougar hunting for sport, in which dogs track the animal until it is treed, is strictly a slaughter-for-trophy and should be banned on moral and ethical grounds, initiative backers say.

"Chasing down a lion with a bunch of hounds and blasting it off a tree is pretty punk stuff," Yeates said.

Statements like that, initiative opponents say, demonstrate the pro-117 camp's anti-hunting bias and lack of knowledge. State game regulations require that a hunted animal's meat be used and not wasted. It is true, they say, that the only effective way to hunt the highly elusive cougars is with well-trained dogs, but that success is by no means guaranteed.

"They make it sound as horrendous as possible," Weaver said. "Only about one time in 20 is it even possible that the mountain lion could be shot."

By banning hunting, Weaver and other initiative opponents say, the state is robbed of a tool that it could use in effectively managing lion populations.

"The field data suggest that . . . the good habitat is full of lions and they're moving out into more marginal habitat," said state wildlife manager Mansfield. "Something's going on when they show up in a back yard in Yorba Linda, in the garlic fields of Coalinga."

In 1986, two children were mauled by cougars in Ronald W. Caspers Wilderness Park in Orange County--the first documented attacks on humans in California in several decades. Earlier this year in the same general area, a male lion establishing his territory is believed to have killed two lion cubs.

Some biologists theorize that overly dense populations increase the animals' competition for food and territory, pushing them into more frequent encounters with humans, pets and livestock. Those encounters often lead to legal depredation kills--which have increased markedly in recent years--of the unknowing, wayward animals.

"It's hard to argue that's good for their lives," Mansfield said. "In theory, some amount of sport hunting could be good for the overall health of the animal."

But initiative proponents, citing research that suggests that attempts to manage lion populations are futile, say the animals don't need any help from Fish and Game.

"They regulate their own numbers." Negri said. That's all part of the evolutionary process."

Mountain Lion Ranges Proposition 117 on the June ballot would protect the range of California's mountain lion by purchasing threatened territory. This map indicates the areas where the big cat is now found, including areas that are threatened by urban encroachment. Source: Mountain Lion Preservation Foundation

---

**Los Angeles Times**  Copyright 2014 Los Angeles Times

# Exhibit C

Case 3:14-cv-01856-GEB-AC   Document 43-3   Filed 06/26/15   Page 19 of 22

## Los Angeles Times | ARTICLE COLLECTIONS

← Back to Original Article

# The Lion's Share of Controversy : Prop. 117: The ballot initiative would prevent hunting mountain lions, and it incites emotions from both sides of the issue.

May 29, 1990 | RICH ROBERTS | TIMES STAFF WRITER

The hunter finds a track and sets his dogs on the scent. Sometimes, after an all-day run, they tree their prey.

"Then," reads a two-year-old, full-page ad of the Mountain Lion Preservation Foundation, "from point-blank range, you fire away, blowing the animal to bloody lint."

And that, allowing for the emotional language of those who don't approve, is how mountain lions are hunted.

The method may not be pretty but, to those philosophically opposed to all hunting, any way of killing creatures by men is ugly.

Conversely, Walter E. (Howdy) Howard, Ph.D., professor emeritus of wildlife biology at UC Davis, suggests that the standard method of hunting lions--a sure, short-range, clean kill--is more humane than other forms of hunting and certainly more humane than what man is doing to mountain lions in his misguided attempts to protect them. Mountain lions, Howard says, are being loved to death.

"It's not endangered, it's not threatened," he said. "It's a bloody pest."

Those views are further polarized by state Proposition 117, the Wildlife Protection Act of1990--the so-called "mountain lion initiative"--on the June 5 ballot.

Actually, the initiative is less about mountain lions than real estate. Prop. 117 presents no biological data on mountain lions but states that "corridors of natural habitat must be preserved to maintain the genetic integrity of California's wildlife."

Under Prop. 117, the state Fish and Game Code would be amended to prevent the hunting of mountain lions forevermore.

The initiative would create the Habitat Conservation Fund to spend $30 million a year for 30 years to buy and reserve wildlife habitat. One-third is earmarked for mountain lions and deer--a lion's principal prey--and two-thirds would go to assist unspecified rare, threatened and endangered species, which do not include lions and deer.

In California, the mountain lion was a bounty animal as recently as 1963, then was designated a game mammal for regulated hunting until '72 and subsequently a "specially protected mammal" during a hunting moratorium that expired in '86.

Then the Fish and Game Commission again designated it a game mammal but lost proposed hunts to animal-rights groups in court in '87 and '88. Prop. 117 would restore the mountain lion's status as "specially protected."

Half of the annual $30 million would be spent in Southern California, the other half in northern California. Opponents point out that a female mountain lion needs 50 or 60 square miles of range, a male 100 or more--in whole parcels, not small chunks connected by corridors. They ask, where can anyone buy land like that, especially in Southern California, and then persuade lions to live there?

That's why opponents claim Prop. 117 is nothing less than a pork-barrel piece for certain legislators and a land grab for private interests to acquire property in the Santa Monica Mountains and elsewhere. Prop. 117, opponents say, is riding the crest of environmental fever and using the mountain lion as an emotional focus to carry it to victory.

Wildlife biologists say the mountain lion needs no protection and, conservationists say, the $30 million will be stripped from more important existing programs.

Edna Maita, senior consultant for the Assembly Committee on Water, Parks and Wildlife, suggested that Prop. 117 is a "shortcut" to achieve a *de facto* endangered listing for mountain lions, without establishing scientific support.

Even Gerald Meral, director of the Planning and Conservation League that sponsored the measure, says: "The mountain lion's not an endangered species. It is not threatened by extinction from hunting. We would never argue that."

But Meral listed $400,000 from the Endangered Species Tax Checkoff fund, along with proposed siphons from salmon, steelhead and the kangaroo rat programs, in a letter to Pete Bontadelli, director of the Department of Fish and Game, suggesting where the $30 million would come from.

"No existing environmental program would in any way be diminished by the passage of Proposition 117," Meral wrote in a cover letter to reassure conservationists. "Director Pete Bontadelli has agreed that the funding analysis in this letter is accurate."

But Bontadelli's chief aide, Ted Thomas, said: "That doesn't mean we're agreeing there is no impact. We still don't know what direction the thing would go."

Maita said Prop. 117 "provides for a major reallocation of money for habitat acquisition. What happens to programs that are currently funded out of there? (For) the Department of Fish and Game . . . the potential is for (a loss of) $10-$12 million."

12/16/2014    The Lion's Share of Controversy : Prop. 117: The ballot initiative would prevent hunting mountain lions, and it incites emotions from both sides of the issue. -…

Case 2:14-cv-01850-GEB-AC    Document 43-5    Filed 06/26/15    Page 20 of 22

The DFG already has instituted a $2,500 permit fee, to meet a $750-million budget deficit in the fiscal year ending June.

Prop. 117 began life as Assembly Bill 860, introduced a year ago by Richard Katz (D-Panorama City). Interviewed in his capitol office recently, he didn't remember the number.

Questioning an aide, he referred to "the mountain lion bill."

Katz said: "I thought I could get a bill passed that would ban the sport hunting of mountain lions. The amendments I was forced to take in the Water Committee rendered the bill so useless that I didn't feel there was much left for what we were trying to accomplish."

The bill sits moribund in the Assembly Ways and Means Committee.

"For all intents and purposes it's dead," Katz said. "When it became apparent I could not get a bill out of the assembly that would accomplish the goal, we dropped the bill and went to the initiative."

That's when the $30 million-a-year add-ons came in.

With a volunteer force blitzing shopping malls all over the state, the initiative secured almost 700,000 signatures, nearly double the 372,000 needed to qualify for the ballot.

It may have helped that the petitions bore a blown-up likeness of a mountain lion.

Meral, in his tiny, cluttered office near the capitol, smiled and said: "Suppose we had a picture of an eagle. Would you say that was misleading? We had to put something on there.

"We call it the wildlife initiative. The title is the Wildlife Protection Act. That's exactly what it is. This is not set up to stop hunting. This is to stop hunting mountain lions. It's a cruel and unfair and unsporting method of hunting. (The Planning and Conservation League is) a pro-hunting organization."

Terry Mansfield, assistant wildlife division chief for the DFG, told of Meral's comment, said: "Pro-hunters? Well, that's an interesting twist. *Whoa!*

"This is a sensationalized, emotional issue. (At) the signature-gathering sessions, it was typically a table set up with a couple of individuals who have no technical background or knowledge . . . (and) they have a big picture of a domesticated lion, and they say, 'Please sign here if you want to save the lions. They're killing 'em.' "

Early on, opponents were ready to throw in the towel. Since hunters make up only about 1.2% of the state's population, they didn't see much hope for support from non-hunters--and certainly not anti-hunters, such as those represented by the Mountain Lion Preservation Foundation.

Sharon Negri, the latter group's executive director, said: "The majority of hunters are absolutely opposed to shooting a top-of-the-food-chain predator like the mountain lion. The California mountain lion may not be endangered, but we feel they are *in danger*. We've tripled in population. The lion needs a lot of space to survive. We don't want to wait until it's on the brink of extinction."

Some of the groups backing Prop. 117 *are* opposed to hunting, but most hunters wouldn't think mountain lions are worth the trouble. "Lions aren't easy to hunt," says Howard. "To hunt lions effectively, you need dogs. This makes human predation very humane. It's pretty hard to miss. You nearly always get a clean kill of a lion in a tree. With deer and other animals, you don't."

Howard, who maintains a small but busy office in a basement at UC Davis, has written extensively and lectured internationally on the dangers of overprotecting species. Left to themselves, Howard says, lions become overpopulated and, when normal prey, such as deer, is exhausted, turn to domestic animals or to cannibalizing their young.

"Is that preferable to chase, tree and quick shot?" Howard asks.

The DFG estimates there are at least 5,100 mountain lions in California--the only area among 11 Western states and two Canadian provinces where they can't be hunted.

The sides agree that the exact numbers don't really matter.

Meral said: "We don't know how many lions there are out there. But the point is that unless we do something to protect habitat, there

aren't going to be any deer or mountain lions."

Howard says that Meral and his allies miss the point: There are *too many* mountain lions.

"The best evidence that they've exceeded their habitat is the frequency with which lions are seen today in California," he said. "These are secretive animals. We shouldn't see them. Most hunters never see mountain lions. The last decade, they've been seeing them in their headlights and in broad daylight."

There has been a large increase in mountain lion sightings in the Eastern Sierra this spring.

Meral said: "What it indicates to me is that there are now people in California where there weren't people before, so they're seeing a lot of mountain lions. Is that evidence that there are more mountain lions or more people?"

There may be other reasons, such as diminishing deer herds and the four-year drought, mountain lions leave their customary cover to kill sheep or domestic

Case 2:11-cv-00550-GEB-AC   Document 43-3   Filed 05/26/15   Page 21 of 22

animals, but Howard believes that the wild population, even creatures at the top of a food chain, need predators. "Evolution has demanded that they have a regulatory mortality factor," Howard said. "That's the balance of nature. Any species that doesn't is in trouble. Look at human beings."

Regulatory mortality factor? Translation: hunting.

And if hunting seems cruel, Howard added: "People are far more humane to their prey than any natural predators. People prey under regulations."

A concern of the DFG and pro-hunting groups is that Prop. 117 would launch a sequence of hunting bans--today mountain lions, tomorrow deer, etc.--that would remove wildlife management from their hands.

Meral said: "We sent them a letter saying, 'We hereby promise we'll never do that,' and so did all the other (pro-117) groups."

Katz said the DFG, National Rifle Assn. and other pro-hunting groups are trying to make it a hunting issue.

"I'm not opposed to all hunting, (although) it's not something I do," he said. "It's not a hunting issue. It's a mountain lion issue."

Either way, an observer might wonder if the numbers are worth all the concern.

From 1907 until '63, a bounty hunter could collect from $5 to $75 for a mountain lion pelt.

"We averaged 223 lions a year," Mansfield said.

In the last two seasons that lions were legally hunted in California--'70-71 and '71-72--the DFG issued 4,953 permits; 118 lions were killed.

Seventy two were killed last year on 169 special depredation permits issued by the DFG when the lions intruded on man's domain. That was up from 64 lions on 148 permits in '88 and 47-114 in '87, and well up from the few in the early '70s when hunting was allowed.

Depredation permits would still be allowed under Prop. 117, but although most are handled by experts with trained dogs, the success rate is only a little better than 40%.

Hunters say hunting mountain lions is sport, but even that is not the primary concern most opponents have about Prop. 117.

Paul Beier, a University of California wildlife biologist who has been doing mountain lion research for the DFG in Orange County, said: "Our problem here is they're paving the hills and they're running out of space. The way we'll wipe 'em out is by fragmenting their habitat. They need room--not two or three square miles here and there."

Richard A. (Dick) Weaver of Loomis, Calif., last year retired after 40 years as a wildlife biologist with the DFG. His career was devoted to research--most of it in the field--of the mountain lion and desert bighorn sheep.

Weaver heads the Californians for Fair Spending on Wildlife Protection committee to defeat Prop. 117. He minces no words.

"You never saw such a mass of ignorance as those people (who) don't know--and don't want to know," Weaver said, speaking of proposition proponents. "It scares me because they have a very good chance of winning."

"Losing mountain lion hunting doesn't make a hell of a lot of difference in how many mountain lions are going to be out there at any given time, the quotas would be so small. But what I worry about is losing an opportunity to hunt *by referendum*. Is that a first domino? Would we lose all the other things we cherish--quail hunting, duck hunting, deer hunting?

"I've always said that biology wouldn't have a damn thing to do with the status of mountain lions. Emotion was going to rule."

THE ATTEMPT TO PROTECT MOUNTAIN LIONS

Prop. 117, the California Wildlife Protection Act, proposes to create the Habitat Conservation Fund to spend $30 million a year for 30 years to acquire and reserve wildlife habitat and to ban the hunting of mountain lions.

WHERE THE MONEY WOULD COME FROM

(Estimated annual diversions)

1. Unallocated account, tobacco tax fund: $18,000,000.

2. Tahoe Conservancy tobacco tax funds: $500,000.

3. Natural Areas Office: $600,000 from environmental license plate fund (ELPF).

4. Salmon and steelhead program: $1,000,000 (ELPF).

5. Fish and wildlife improvement on federal lands: $100,000 (ELPF).

6. Kangaroo Rat Preserve: $500,000 (ELPF).

7. Dept. of Water Resources allocations from ELPF: Trinity River restoration, $750,000 minimum; Sacramento River riparian restoration, $750,000.

12/16/2014    The Lion's Share of Controversy : Prop. 117: The ballot initiative would prevent hunting mountain lions, and it incites emotions from both sides of the issue. -…

Case 2:14-cv-01856-GEB-AC    Document 43-3    Filed 06/26/15    Page 22 of 22

8. CCC stream restoration budget: $250,000.

9. Dept. of Fish and Game tobacco tax funds for stream restoration studies: $117,000; non-game fisheries, $300,000 minimum.

10. DFG tobacco tax funds for anadromous fisheries: $1,500,000.

11. Wildlife Conservation Board: $1,658,000.

12. Coastal conservancy fish and wildlife enhancement fund: $150,000.

13. Endangered species tax checkoff fund: $400,000.

SOURCE--California Wildlife Protection Committee (Project of Planning and Conservation League)

NOTE--A legislative analyst has determined that the Legislature could transfer $12 million or more from general fund, instead of existing environmental funds.

WHERE THE MONEY WOULD GO

(Designated annual expenditures)

1. $5,000,000 for 10 years to Santa Monica Mountains conservancy.

2. $4,500,000 to Dept. of Recreation and Parks.

3. $4,000,000 to state coastal conservancy.

4. $500,000 to California Tahoe conservancy.

5. Balance to Wildlife Conservation Board.

SOURCE--California Wildlife Protection Act of 1990 (proposed).

---

## Los Angeles Times

Copyright 2014 Los Angeles Times